Andrew Guidi
DELANEY WILES, INC.
1007 West Third Avenue, Suite 400
Anchorage, AK 99501
  (907) 279-3581
  (907) 277-1331 fax
*Attorneys for Defendant*
*AMERICAN HOME ASSURANCE COMPANY*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA AT ANCHORAGE

| | |
|---|---|
| TJ IVEY, RENEE M. CROUSE, BRIAN J. CROUSE, and JESSICA LYNN SKEEN, <br><br><br> Plaintiffs, <br> vs. <br> AMERICAN HOME ASSURANCE COMPANY, <br><br> Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. A03-0202-CV (TMB)

**AMERICAN HOME ASSURANCE COMPANY'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

The incontrovertible facts in this case establish as a matter of law that American Home had no duty to defend under its errors and omissions policy because the underlying complaint against its insured did not involve professional services and because the claim arose out of criminal and malicious conduct, bodily injury and property damage. Accordingly, this Court

1

should grant American Home Assurance Company ("American Home")
summary judgment, dismissing plaintiffs' action.

## I.    INTRODUCTION

Plaintiffs ("Ivey") originally brought suit against Conrad
J. Worthy, a State Farm insurance agent who carried an American
Home errors and omissions insurance policy. The errors and
omissions policy covered Worthy for negligence in the performance
of professional services as an insurance agent. T.J. Ivey,
Worthy's former girlfriend, sued Worthy, alleging he had sexually
assaulted her and damaged her automobile. Worthy settled with
the Ivey plaintiffs and signed a document purporting to assign
rights against American Home to them.

Ivey has now brought suit against American Home, alleging
American Home was negligent and acted in bad faith. Ivey alleges
American Home failed to defend Worthy in the sexual assault suit.

American Home is entitled to summary judgment for the
following reasons: (1) the complaint in the sexual assault suit
did not potentially trigger coverage under the errors and
omissions policy because the policy covered only negligent acts,
errors, and omissions in rendering or failing to render
professional services; and (2) the policy's criminal act,
malicious act, bodily injury and property damage exclusions
excluded Ivey's claim from coverage because the claim arose out
of criminal sexual assault and intentional property damage, to

2

which Worthy pleaded guilty. For the foregoing reasons, this Court should grant American Home's motion for summary judgment at this time.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A. CRIMINAL PROSECUTION

This case began as a criminal prosecution against Worthy. A jury convicted Worthy of sexual assault and criminal mischief, based on his violent actions against T.J. Ivey (Worthy's former girlfriend), and based on the intentional damage he inflicted on her property.[1]  On appeal, Worthy's convictions were reversed.[2] After remand, Worthy pleaded guilty to fourth-degree Assault[3] and fourth-degree Criminal Mischief.[4]

### B.  UNDERLYING CIVIL SUIT

As a result of Worthy's criminal convictions, T.J. Ivey (previously known as T.J. Skeen) brought a civil claim ("underlying civil suit") against Worthy and State Farm Insurance Company in tort. T.J. Ivey alleged Worthy sexually assaulted and harassed her, and that Worthy destroyed her property. Worthy was represented in that case by competent Alaska counsel, Ms.

---

[1]  Exhibit A hereto, Ivey's First Amended Complaint in the underlying civil suit (dated December 11, 1997), Case No. 3AN-96-6147 Civil, page 7; *see Worthy v. State*, 999 P.2d 771, 773 (Alaska 2000)(reversing Worthy's conviction for second-degree sexual assault and remanding).
[2]  *Worthy v. State*, 999 P.2d at 776.
[3]  Alaska Stat. § 11.41.230.
[4]  Alaska Stat. § 11.46.484; Exhibit B hereto, guilty pleas to fourth-degree Assault and fourth-degree Criminal Mischief.

Christine Schleuss.  Ms. Schleuss tendered defense of the lawsuit to State Farm Insurance Company in approximately June 1998.[5]  In a letter written September 15, 1998, State Farm subsequently agreed to pay Worthy's legal costs from the date of tender forward.[6]

Ivey alleges that after Schleuss had learned State Farm would pay Worthy's legal costs, Schleuss tendered the lawsuit to American Home.  Ivey alleges Schleuss tendered the lawsuit to American Home in a letter written on September 18, 1998.[7] American Home denies ever having received such a letter.  Ivey does not claim a tender letter was sent by certified or registered mail.  And the letter Schleuss allegedly sent to American Home did not follow the designated procedure established for the American Home insurance policy.[8]  Although Schleuss personally received a copy of the complaint in February 1997,[9] there is no allegation that Schleuss attempted to inform American Home of the lawsuit until September 1998.  Further, Schleuss never contacted American Home after she allegedly sent the tender letter to determine whether American Home had received the

---

[5] Exhibit C hereto at page 1, letter from Christine Schleuss to Conrad Worthy, dated September 18, 1998.

[6] Exhibit D hereto at page 2, letter from William D. Marr, State Farm Claim Superintendent, stating State Farm will pay Worthy's legal costs from the date the lawsuit was tendered to State Farm.

[7] Exhibit E hereto, alleged tender letter from Schleuss to American Home, which was attached as Exhibit C to Ivey's Complaint in this case.

[8] Exhibit F hereto, "Agents Errors and Omissions" at page 2.

[9] Exhibit G hereto at page 1, Affidavit of Counsel, Christine S. Schleuss, March 4, 1997.

letter, or was going to accept defense of Worthy. As a result of these circumstances, American Home never became aware of the lawsuit against Worthy. American Home thus never opened a claim file regarding the lawsuit against Worthy. The first notice American Home received that Worthy had been sued was when American Home was sued in this action.

While it is unknown whether Schleuss in fact perfected a tender of defense of the lawsuit to American Home, what is known is that Schleuss stated in a letter to Worthy – written on the same day the American Home tender letter was dated and allegedly sent – that she doubted whether the American Home errors and omissions policy would apply to Worthy's case: "[q]uite frankly, I am doubtful whether [the American Home] policy will protect you [Worthy] in any way because it seems to exclude the allegations in this amended complaint."[10] In addition, even if Schleuss had tendered the lawsuit to American Home and American Home had received it, Worthy would not have incurred any legal costs he would not have already incurred because State Farm agreed to pay Worthy's costs from approximately June 1998 forward. Even if American Home's policy had applied, it would have paid Worthy's costs only from September 1998 forward.[11]

---

[10] Exhibit C at 1.
[11] *See* Exhibit D at 2.

In the underlying civil suit, Ivey entered into an agreement with the defendants whereby State Farm Insurance Company paid Ivey $550,000 and Conrad Worthy signed a document purporting to assign to Ivey Worthy's rights, if any, against American Home. Assignment of Worthy's claims relates to the "incident" alleged by Ivey in the underlying civil suit.

The factual basis for Ivey's claims against Worthy are set forth in Ivey's First Amended Complaint in the underlying civil suit, Case No. 3AN-96-6147 Civil.[12]  That Complaint alleged Worthy was an agent of State Farm Insurance Company.  That Complaint also alleged Worthy and Ivey were involved in an intimate relationship beginning in November 1992, when they met at a restaurant where Ivey was working in Anchorage.[13]

The Ivey complaint alleged Worthy was a friend of T.J. Ivey's brother, who introduced Worthy and Ivey.[14]  Worthy and Ivey's romantic relationship lasted intermittently from November 1992 until approximately April 30, 1994.[15]  In addition, Worthy and Ivey cohabitated from July 1993 until September 1993.[16] Worthy and Ivey broke up for a short time in September 1993, but they began to date again soon thereafter.[17]  Ivey also worked as a

---

[12] *See* Exhibit A.
[13] *Id.* at 2.
[14] *Id.*
[15] *Id.* at 2-4.
[16] *Id.* at 3.
[17] *Id.*

receptionist in Worthy's office for approximately three weeks in October-November 1993.[18]    Subsequently, Ivey left her job at Worthy's office.

The Ivey complaint also alleged that in February of 1994, T.J. Ivey accepted employment with MarkAir Express in Barrow, Alaska, which required her to live in Barrow for the weeks she worked, and allowed her to remain in Anchorage when she was not working.[19]   While living in Barrow, Ivey alleged she was raped on or about March 31 or April 1, 1994.[20]   Ivey alleged the romantic relationship between T.J. Ivey and Worthy deteriorated after Ivey's rape because Worthy accused her of having encouraged the rape.[21]   Ivey alleged that on or about April 30, 1994, she ended the relationship with Worthy.[22]   MarkAir Express subsequently transferred Ivey to a job in St. Mary's, Alaska.[23]

Ivey also alleged that on or about August 5, 1994 she returned to Anchorage.[24]   During Ivey's trip to Anchorage, Worthy asked Ivey out for dinner, and she accepted.[25]   Ivey drove to

---

[18]  *Id.*; Exhibit H hereto, Answer of Conrad J. Worthy to First Amended Complaint in the underlying civil suit (dated October 6, 1998), Case No. 3AN-96-6147 Civil, page 3.
[19]  Exhibit A at 3.
[20]  *Id.*
[21]  *Id.*
[22]  *Id.* at 4.
[23]  *Id.*
[24]  *Id.*
[25]  *Id.*

Worthy's house.[26]   Ivey alleged that during the evening, Worthy repeatedly attempted to convince her to resume their relationship and to resume working for him, "referring often to his erroneous belief that they were supposed to get married at the end of the year."[27]  The complaint alleged Ivey "consistently stated that she would not be getting back together with him."[28]   After dinner, Ivey accepted Worthy's offer to drive her to her car.[29]   Ivey alleged that during the drive, Worthy became upset when Ivey refused to resume working for him.[30]   Ivey also alleged Worthy became irate and verbally abusive.[31]

During the early morning hours, Worthy drove Ivey to his office instead of driving her to her car.[32]  The complaint alleged that, as the night progressed, Worthy began to physically and sexually assault Ivey.[33]   The complaint also alleged that Worthy threw objects at Ivey; "attempted to strangle her; ripped her clothing and forced his hand into her vagina, telling her to pretend he was the man who had raped her in Barrow. He tried to get her away from the windows and to a back room, but she

---

[26] *See* Exhibit A at 6.
[27] Exhibit A at 4.
[28] *Id.*
[29] *Id.*
[30] *Id.*
[31] *Id.*
[32] *Id.* at 5.
[33] *Id.*

resisted, fearing that he would kill her."[34]   Ivey alleged that

Worthy attempted to get Ivey back into his car and, at that

point:

> she escaped, running naked and bleeding along
> Minnesota, dodging Mr. Worthy because she feared he
> would attempt to run her down, to Mike's Mini-Mart on
> the corner of Tudor and Wilson, where she asked an
> employee to call 911.  An officer came and escorted her
> to Alaska Regional Hospital.[35]

That same night Worthy also damaged Ivey's car by slashing

her tires, breaking the windows and lights, and pouring buckets

of paint throughout the car's interior.[36]   The complaint also

alleged Worthy stole Ivey's medical and psychological records,

which she had stored in a filing cabinet in his garage.[37]

Worthy was arrested for his assault on Ivey and intentional

damage to her automobile and then released on bail.[38]   The

complaint alleged Worthy repeatedly violated his bail conditions

by contacting Ivey, and he was repeatedly taken back into

custody.[39]   Worthy allegedly continued to harass Ivey, so she

filed a 90-Day Domestic Violence petition for injunctive relief

on September 30, 1995.[40]   In the domestic violence petition, Ivey

described herself as Worthy's "ex girlfriend from more than 1 yr

---

[34] *Id.*
[35] *Id.*
[36] Exhibit A at 6.
[37] *Id.*
[38] Exhibit A at 7.
[39] *Id.*
[40]  Exhibit I hereto, Petition for Injunctive Relief - Domestic Violence (dated September 30, 1995), Case No. 3AN-95-8353 Civil.

ago."[41] She explained that Worthy had committed domestic violence against her as follows: "August 6, 1994 – Worthy tried to kill me by stranglation [sic] twice.  He also committed other acts of violence against me that evening."[42]  The court issued an Emergency Domestic Violence Order, and set a hearing for October 16, 1995.  The order found Ivey had been the victim of domestic violence at the hands of Worthy.  After the hearing on October 16, 1995, the court granted Ivey's petition for a 90-Day domestic violence order.

In Worthy's Sentencing Memorandum, Worthy's attorney compared Worthy's relationship with Ivey to that of a couple going through a divorce.[43]  Worthy's attorney characterized the sexual assault and intentional property damage that formed the basis of the criminal case as equivalent to a domestic dispute in which "good, law-abiding people reach a point in a relationship where they do stupid, nasty things."[44]  Worthy's attorney also characterized the relationship as "an unfortunate, bitter relationship in which both sides exploited the other."[45]

In the underlying civil suit, the Ivey complaint alleged sexual harassment, assault, sexual assault, the tort of outrage,

---

[41] *Id.*
[42] *Id.*
[43] Exhibit J hereto, Sentencing Memorandum of Conrad Worthy (dated September 11, 1995), Case No. 3AN-94-5757 Criminal, page 3.
[44] *Id.*
[45] *Id.*

negligent infliction of emotional distress, intentional infliction of emotional distress,[46] negligent destruction of property, invasion of privacy, and willful, wanton, reckless disregard of foreseeable consequences.[47] Ivey also alleged "Worthy became extremely violent and physically and sexually assaulted [Ivey]."[48] According to Ivey's First Amended Complaint, Ivey "suffered serious physical, emotional and psychological injuries as a result of this incident."[49]

### C.   WORTHY'S DUTIES WITH STATE FARM INSURANCE COMPANY

Worthy's contract with State Farm Insurance Company established his professional services as an insurance agent for State Farm.  On November 26, 1990, Conrad Worthy signed a new State Farm Agent's Agreement with State Farm Insurance Companies.[50]  Section I(A) of that agreement specified Conrad Worthy's duties as an agent of State Farm as follows:

> The Agent will solicit applications for insurance, collect initial premiums, membership fees and charges, countersign and deliver policies, reinstate and transfer insurance, assist policyholders and cooperate with adjusters in reporting and handling claims, avoid conflicts of interest, and cooperate with and advance the interests of the Companies, the agents, and the policyholders.

---

[46] Exhibit A at 8 – 10.
[47] *Id.* at 11-12.
[48] *Id.* at 4.
[49] *Id.* at 5.
[50] Exhibit K hereto, copy of State Farm Agent's Agreement with attached Memorandum of Agreement, signed by Conrad Worthy on November 26, 1990.

Worthy was classified as an independent contractor for all purposes and his office expenses, including rental, furniture and equipment, signs, and supplies not furnished by State Farm, salaries of his employees, telegraph, telephone, postage, advertising, and all other charges or expenses incurred by him in the performance of the Agreement, were to be incurred at his discretion and paid by him.[51]

In the underlying civil suit an Affidavit of Conrad J. Worthy,[52] dated August 25, 2000, was submitted to the court.[53] Worthy signed that Affidavit, which stated he had become an insurance agent for State Farm Insurance Company beginning March 1, 1984, and that from November 1990 to June 1995, he owned and operated an insurance business in his name, and that he was an independent contractor of State Farm.[54] In that Affidavit, Worthy specifically described his duties as a State Farm insurance agent as follows:

> 3. My duties as an insurance agent included submitting applications for insurance, collecting initial premiums, memberships fees and charges, countersigning and delivering policies, reinstating and transferring insurance, assisting policyholders and cooperating with adjusters

---

[51] *Id.* at Sections I(B) and (E).
[52] Exhibit L hereto, is a true and correct copy of an affidavit, dated August 25, 2000 and filed in state court in the underlying civil suit, T.J.S. v. State Farm Insurance Company, 3AN-96-6147 Civil.
[53] *Id.*
[54] *Id.* at Paragraph 2.

and reporting and handling claims, avoiding
conflicts of interest and cooperating with
and advancing the interests of State Farm,
the agents, and the policyholders.[55]

. . . .

16. . . . Employment decisions,
including offers, hires, and terminations,
were not within the scope of my duties as an
insurance agent and were not governed in any
way by State Farm.[56]

. . . .

17. On August 6, 1994, I damaged a car,
to which T.J.S. had title and in which I held
an ownership interest, which T.J.S. had left
in my personal garage. The damage inflicted
on the car did not arise out of nor was it
incidental to any of my work activities as a
State Farm insurance agent.[57]

. . . .

18. T.J.S. was not an employee of
Conrad J. Worthy Insurance in August of
1994.[58]

. . . .

19. I did not utilize a State Farm
database or any other State Farm equipment,
computer programs or files to locate the
address and telephone number of [Ivey].[59]

This statement by Worthy in his sworn and notarized

affidavit establishes Worthy's professional duties for State

---

[55] *Id.* at Paragraph 3.
[56] *Id.* at Paragraph 16.
[57] *Id.* at Paragraph 17.
[58] *Id.* at Paragraph 18.
[59] *Id.* at Paragraph 39.

Farm.   Worthy's affidavit further establishes Worthy was not acting in his capacity as a State Farm insurance agent when he physically and sexually assaulted Ivey and damaged her automobile.   As will be argued in this memorandum, because Worthy's errors and omissions policy covered only his negligent acts, errors, and omissions in rendering or failing to render professional services as a State Farm insurance agent, and because Ivey's complaint did not arise from Worthy's professional services, but from a sexual assault on a former girlfriend and vandalism to a former girlfriend's automobile, the insurance policy provides no coverage for Ivey's claims.

### D.   ERRORS AND OMISSIONS INSURANCE POLICY

### 1.   Policy Covered Only Negligent Acts In Rendering Or Failing To Render Professional Services

A copy of a "claims made" professional errors and omissions insurance policy issued by American Home, along with a policy Declarations page, was attached as Exhibit B to the Complaint in this case.[60]   The policy covered only negligent acts in rendering or failing to render professional services.   Paragraph I under the heading "INSURING AGREEMENTS", on the first page of that policy, stated as follows:

> **COVERAGE:**   To pay on behalf of the Insured all sums which the Insured shall become

---

[60]   *See* Exhibit M hereto, a copy of an American Home Assurance Company claims made policy form, which was attached as Exhibit B to Ivey's Complaint in this case.

legally obligated to pay as damages because of any claim or claims first made against the Insured and reported to the Company during the policy period arising out of:

[A] any negligent act, error or omission <u>in rendering or failing to render professional services for others in the Insured's capacity as an Insurance Agent for the Insurance Company or Companies named in the declarations</u> made a part hereof, and caused by the Insured or any person for whose acts, errors, or omissions the Insured is legally responsible;

[B] personal injury caused by an offense arising out of the <u>rendering or failing to render professional services for others in the Insured's capacity as an Insurance Agent for the Insurance Company or Companies named in the declarations</u>.

[Emphasis added.] [61]

Produced in the underlying lawsuit were copies of various files from Worthy's records. One of those files related to Errors & Omissions Insurance. A document produced entitled "Agents Errors & Omissions" describes that type of insurance coverage in part as follows:

The Errors and Omissions policy, provides the following coverage:

It covers you for negligent acts, errors and omissions <u>in conducting business for State Farm</u>, subject to a side agreement between State Farm and American Home.

[Emphasis added.] [62] As will be argued in this memorandum, because Worthy's errors and omissions policy covered only his negligent

---

[61] *Id*. at 1.
[62] Exhibit F hereto at 1.

acts, errors, and omissions in rendering or failing to render his professional services as a State Farm insurance agent, and because Ivey's complaint did not arise out of Worthy's professional services, but out of a sexual assault on a former girlfriend and intentional damage to her automobile, the insurance policy provides no coverage for Ivey's claims.

### 2. Policy Excluded Any Claim Arising Out Of Any Criminal Act, Any Malicious Act, Or Any Claim Arising Out Of Bodily Injury, Or Injury To Property

The American Home errors and omissions policy excluded from coverage several types of claims, among them any claim arising out of a criminal act, any claim arising out of a malicious act, any claim arising out of bodily injury to any person, and any claim arising out of injury to property. Under the heading "EXCLUSIONS" on page two of the policy, the first subsection reads:

> **THIS POLICY DOES NOT APPLY:**
> (A) To any claim arising out of any dishonest, criminal, fraudulent or malicious act, error or omission of any Insured, partner or employee hereunder;
> (B) To any claim arising directly out of bodily injury to, or sickness, or disease or death of any person, or injury to, or destruction of any tangible property, including the loss of use thereof.
>
> . . .
>
> (D) For personal injury sustained by any person as a result of an offense directly or indirectly related to the employment of such person by the Insured;

16

[Emphasis added][63]

According to this exclusionary clause, the errors and omissions policy excluded from coverage all claims arising out of any criminal act, any malicious act, bodily injury to a person, or injury to any tangible property.

In addition to the clear exclusions in Worthy's errors and omissions policy, a letter from Worthy's attorney to Worthy stating she doubted the policy would provide coverage further establishes that the policy excluded Ivey's claim from coverage. In the aforementioned letter Christine Schleuss wrote Worthy on September 18, 1998, Schleuss stated: "Quite frankly, I am doubtful whether [the American Home] policy will protect you in any way because it seems to exclude the allegations in this amended complaint."[64]  Thus, not only did the errors and omissions policy clearly and unambiguously exclude coverage for Ivey's complaint, but Worthy's attorney also stated the policy excluded coverage for Ivey's claim.  As will be argued in this memorandum, because the Ivey complaint arose out of a criminal assault on a former girlfriend[65] and the intentional damage to her tangible property,[66] these insurance policy exclusions prevent coverage for Ivey's claims.

---

[63] Exhibit M at 2.
[64] Exhibit C at 1.
[65] Exhibit B at 1.
[66] *Id.* at 2.

### III. ARGUMENT

#### A.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the materials before the district court "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56 (c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 321, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).

Under settled law, "the construction of an insurance contract is a matter for the court. A policy's meaning is determined by examining the language of the disputed policy provisions, the language of other provisions in the policy, relevant extrinsic evidence, and case law interpreting similar provisions." *Great Divide Ins. Co. v. Carpenter*, 79 P.3d 599, 606 (Alaska 2003). Further, the contract is construed to provide the coverage a layman would reasonably have expected. *Id.* The court looks to the contract terms, interpreted in their ordinary and popular sense as read by a person of average intelligence and experience. *Whispering Creek Condominium Owner Ass'n v. Alaska Nat. Ins. Co.*, 774 P.2d 176 (Alaska 1989).

Where the complaint presents no factual ambiguity regarding coverage, the insured points to no facts outside the complaint that would provide a factual basis for coverage, and a reasonable lay interpretation of the policy would not encompass coverage

under the circumstances, an insurer has no duty to defend the claim. *Makarka v. Great Am. Ins. Co.*, 14 P.3d 964, 969-70 (Alaska 2000).

> Under Alaska case law,
>
> [a] finding of coverage beyond the clear terms of the policy will not be made, however, on the bare allegations of the policyholder that it expected such coverage. The insured must demonstrate through extrinsic evidence that its expectation of coverage was based on specific facts which make these expectations reasonable.

*O'Neill Investigations, Inc. v. Illinois Employers Ins. of Wasuau*, 636 P.2d 1170, 1177 (Alaska 1981) (ruling an insurer had no duty to defend under a professional liability policy because a reasonable person would have had no expectation that the policy would cover an action by the State against the insured for violation of the Unfair Trade Practices and Consumer Protection Act); *see also Makarka*, 14 P.3d at 969-70.

Here, the Ivey complaint did not even potentially trigger coverage under the American Home errors and omissions policy. As will be discussed in greater detail later, the policy limited coverage to acts, errors or omissions in rendering or failing to render professional services. Worthy's violent acts against Ivey were brutish and vicious acts of domestic violence. They did not involve any professional service of any type. It is beyond the pale to assert Worthy's physical and sexual assaults against a former girlfriend and malicious vandalism of her automobile were

19

among the professional services of an insurance agent. Nevertheless, even if one were to assume assaulting a girlfriend and vandalizing her property were included in an insurance agent's professional services, the errors and omissions policy still could not be interpreted as covering the incident at issue because the policy excluded from coverage any claim arising out of a criminal or malicious act, any claim arising out of bodily injury, and any claim arising out of injury to tangible property. Accordingly, this Court should grant American Home summary judgment, dismissing the Ivey action.

> ### B. BECAUSE THE ERRORS AND OMISSIONS POLICY COVERED ONLY NEGLIGENCE IN PROFESSIONAL SERVICES THE CLAIM DID NOT EVEN POTENTIALLY TRIGGER COVERAGE

American Home had no duty to defend Worthy in this case because Ivey's claim raised no possibility of coverage under Worthy's errors and omissions policy. The clear and unambiguous language of the policy limited coverage to claims arising out of a negligent act, error or omission in rendering or failing to render professional services in Worthy's capacity as an insurance agent.[67] Worthy's sexual assault against his former girlfriend and intentional damage to her automobile can be described only as outrageous. But physically and sexually assaulting a former girlfriend and maliciously vandalizing a former girlfriend's car

---

[67] Exhibit M at 1.

20

cannot under any interpretation be characterized as rendering or failing to render professional services. Worthy's errors and omissions insurance policy unambiguously granted coverage only for claims arising out of Worthy's professional services for others as an insurance agent.[68] Thus, the claim in this case did not even potentially trigger American Home's duty to defend or indemnify.

While Worthy's errors and omissions policy does not define "professional services", the Alaska Supreme Court defined the term in *American Motorists Insurance Company v. Republic Insurance Company*, 830 P.2d 785, 787 (Alaska 1992). In that case, the court considered whether an architect's competitive bid for a contract to design a school building was a "professional service", and thus covered under the architect's insurance policy. *Id*. at 786. An architectural firm, ECI/Hyer, had submitted a competitive bid for a contract to design a school building. *Id*. A second architectural firm, LKP, subsequently sued ECI/Hyer for, among other things, fraudulent and negligent misrepresentation in the bid. *Id*. at 786-87. Republic Insurance Co. ("Republic") insured ECI/Hyer under a "claims made" errors and omissions policy at the time LKP filed its complaint. *Id*. at

---

[68] Absent any ambiguity, the terms of an insurance contract are given their plain, ordinary meaning. *Allstate Ins. Co. v. Roelfs*, 698 F.Supp. 815, 819 (D. Alaska 1987) (citing *Jarvis*, 633 P.2d at 1363 and *INA Life Ins. Co. v. Brundin*, 533 P.2d 236, 239-42 (Alaska 1975)).

787.   The insurance policy required Republic to insure ECI/Hyer against any claim for negligence arising out of "'rendering or failing to render professional services.'"   *Id*. at 787.   Republic denied coverage and refused to defend.   *Id*.

American Motorists Insurance Co. ("American") insured ECI/Hyer under an "occurrence based" errors and omissions policy covering the time the firm submitted its bid.   *Id*.   When Republic refused to defend, American successfully defended ECI/Hyer.   *Id*. Subsequently, American sought a pro rata share of the defense costs it had incurred and the trial court granted summary judgment for Republic, ruling that ECI/Hyer's bid submission was not a professional service, and thus, was not covered under Republic's insurance policy.   *Id*.

The court defined the term "professional services" as including acts:

> arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill … and in determining whether a particular act is a 'professional service' the court must look not to the title or character of the party performing the act, but to the act itself.

*Id*. (quoting 7A J. Appleman, *Insurance Law and Practice* § 4504.01 at 309-10).

The court ruled the bid to win a contract was a "professional service" because both practically and legally, (according to state statute) only an architect, "using his or her

22

specialized knowledge, labor and skills could have prepared the bid." *Id*. (quoting 7A J. Appleman, *Insurance Law and Practice* § 4504.01 at 309-10).

The supreme court relied on *Sachs v. St. Paul Fire & Marine Ins. Co.*, 303 F.Supp. 1339, 1341 (D.D.C. 1969), where one attorney sued another attorney for interfering with his client. The D.C. District Court ruled the claim triggered the insurance company's duty to defend under its errors and omissions policy. *American Motorists Ins. Co. v. Republic*, 830 P.2d at 788. The *Sachs* court emphasized the attorney's undertaking to represent another attorney's client "'could only be done by an attorney pursuing his profession.'" *Id*. (quoting *Sachs*, 303 F.Supp. at 1341).

In addition, the Alaska Supreme Court in *American Motorists* distinguished two cases relied on by the trial court because those cases involved disputes between law partners, neither of which involved interaction with actual or potential clients. *Id*. Thus, in the only Alaska case which has defined "professional services" the court emphasized the alleged acts must be ones that only a professional could perform with his or her "specialized knowledge, labor and skills". *Id*.

The Ninth Circuit Court of Appeals, applying Alaska law, has ruled that a professional liability policy does not provide coverage when the insured simply refuses to pay for work

performed by the insured's subcontractor. *Bell Lavalin, Inc. v. Simcoe and Erie Gen. Ins. Co.*, 61 F.3d 742, 746 (9th Cir. 1995). The professional liability policy, or errors and omissions policy, protected Bell Lavalin, an engineering firm, for damages arising out of the firm's "performance of professional service" "caused by an error, omission or negligent act". *Id*. When the sub-contractor fell behind schedule in completing its work, it sought a six-month extension of time to complete the work, and actually thought Bell Lavalin had granted the time extension. *Id*. at 744. Bell Lavalin reneged on the time extension, forcing the sub-contractor to agree to a one-month time extension, about which the sub-contractor expressed reservations. *Id*. When the sub-contractor wrote to Bell Lavalin that the deadline was commercially impracticable and sought the originally proposed six-month time extension, Bell Lavalin refused to grant the previously promised time extension. *Id*. Bell Lavalin then stopped payment on a check for over $800,000, but directed the sub-contractor to continue working. *Id*. The sub-contractor then ceased working on the project when it was 87% complete. *Id*. at 744. When the sub-contractor sued Bell Lavalin, the jury awarded the sub-contractor damages based on its breach of contract claims, in the amount of the unpaid value of the sub-contractor's performance. *Id*. at 745.

Seeking to gin up insurance coverage, Bell Lavalin argued the cause of the subcontractor's damages and the jury verdict was Bell Lavalin's wrongful refusal to grant the time extension. *Id*. at 746. The Ninth Circuit rejected Bell Lavalin's argument that the sub-contractor's damages resulted from the performance of professional services. *Id*. The court ruled instead that Bell Lavalin's simple refusal to pay the sub-contractor for work performed was the "cause" of the sub-contractor's damages. *Id*. The court noted that Bell Lavalin's refusal to grant a time extension was irrelevant to whether Bell Lavalin owed the sub-contractor for work performed. *Id*. The court also ruled the sub-contractor's damages did not arise out of Bell Lavalin's performance of professional services. *Id*. at 747 n.3. The court ruled instead that Bell Lavalin's liability arose from its receipt of the sub-contractor's professional services.

The court noted that interpreting the insurance policy any other way would violate the rule in Alaska that "'an insurance policy must be construed so as to provide the coverage which a layperson would have reasonably expected, given a lay interpretation of the policy language.'" *Id*. at 746 (quoting *O'Neill Investigations*, 636 P.2d at 1175.) The Ninth Circuit ruled Bell Lavalin's errors and omissions policy could not reasonably be read to cover damages resulting from a simple contract dispute in which the insured failed to pay a

25

subcontractor for its work. *Id*. Thus, under Alaska law, there is no coverage under errors and omissions insurance policies granting coverage only for "professional services" unless the claim arises directly and specifically from the insured's professional duties.

The Sixth Circuit Court of Appeals, applying Kentucky law, has ruled an insurer had no duty to defend an insured physician against sexual harassment claims by former employees because sexual harassment "bore no connection to [the insured's] education and training as a physician." *DiBeneditto v. Medical Protective Co.*, 3 Fed.Appx. 483, 487 (6th Cir. 2001) (affirming summary judgment for the insurer that insurer had no duty to defend because claim did not involve "professional services").[69] The insurance policy in that case covered "any claim for damages . . . based on professional services rendered". *Id*. at 486. The court considered whether "professional services" encompassed sexual harassment claims brought against the physician occurring solely within the context of employment. *Id*. The court ruled

---

[69] The Sixth Circuit Court of Appeals, applying New York law, has also ruled an insurer had no duty to defend an insurance agency under an errors and omissions policy when the claim alleged the insurance agency committed intentional and malicious acts of libel, defamation, and tortious interference with prospective business and contractual relations, rather than negligent and careless acts. *U.S. Fidelity and Guar. Co. v. Firemen's Fund Ins. Co.*, 896 F.2d 200, 203 (6th Cir. 1990) (affirming summary judgment for insurer on grounds that insurer had no duty to defend).

the claims of sexual harassment did not involve the physician's "professional services" because "[s]omething more than an act flowing from mere employment or vocation is essential. The act or service must be such as exacts the use or application of special learning or attainment of such kind." *Id.* at 486-87 (citing *Marx v. Hartford Accident & Indem. Co.*, 157 N.W.2d 870, 871-72 (Neb. 1968) (ruling there was no coverage because insured was not rendering "professional" acts)). The Sixth Circuit also ruled that the liability the physician encountered under employment was an additional risk from his professional services liability, for which the physician could obtain additional insurance coverage. *Id.* at 487. Thus, the Sixth Circuit has also ruled an insurer has no duty to defend under a professional liability policy covering "professional services" when the claim alleged sexual harassment because the insured's acts must require the use of special learning to be a "professional service".

The New York Supreme Court has ruled that an insurer had no duty to defend its insured, a general insurance agent, under an errors and omissions policy on a claim alleging misrepresentations and wrongful acts in hiring and firing another agent. *Propis v. Firemen's Fund Ins. Co.*, 492 N.Y.S.2d 228, 230-31 (N.Y. App. 1985). The appellate court ruled that the insured's alleged acts relating to the hiring and firing of another agent are non-professional business activities, rather

than "professional services" as required by the errors and omissions policy. *Id*. at 231. In that case, life insurance underwriters were insured under an errors and omissions policy granting coverage on any claim arising out of any "negligent act, error or omission in rendering or failing to render professional services." *Id*. at 230. In separate declaratory actions, two plaintiffs, both general agents of the Northwestern Mutual Life Insurance Company sought declaratory judgments that their errors and omissions insurers had a duty to defend them against claims brought by a former insurance agent. *Id*. The court ruled that the complaint had failed to allege that the act or omission complained of was "in rendering or failing to render professional services." *Id*. The court emphasized: "*An errors and omissions policy is intended to insure a member of a designated calling against liability arising out of the mistakes inherent in the practice of that particular profession or business*." *Id*. at 231. (emphasis in original) (quoting *Schiff Assoc. v. Flack*, 51 N.Y.2d 692, 700 (N.Y. 1980)). The court ruled the alleged acts relating to hiring and firing the insurance agent are "non-professional business activities which 'set the stage for performance' but which do not involve professional services to clients and are not themselves acts 'inherent in the practice of [the] particular profession' – underwriting". *Id*. Thus, the New York appellate court, like the other courts discussed above, ruled that an act

must be something inherent in the particular profession to be a "professional service".

Here, American Home had no duty to defend or indemnify Worthy because the Ivey complaint did not arise out of Worthy's negligent acts, errors or omissions in rendering or failing to render professional services as an insurance agent. The Ivey complaint alleged Worthy physically and sexually assaulted a former girlfriend and maliciously vandalized the former girlfriend's vehicle.[70] Physical and sexual assault of a former girlfriend and malicious vandalism of a former girlfriend's vehicle are vicious acts of violence. They do not in any way resemble the professional services of an insurance agent. Unlike the preparation of a competitive bid to build a school performed by an architect, as considered in *American Motorists*, Worthy's sexual assault against a former girlfriend did not require the specialized knowledge and skill of an insurance agent. *See American Motorists Insurance Company v. Republic Insurance Company*, 830 P.2d at 788.

The coincidental fact Worthy had an errors and omissions policy covering his professional acts as an insurance agent cannot avail Ivey here. Ivey's unconcealed attempt to obtain a damage award from Worthy's errors and omissions insurer cannot succeed when the policy covered only Worthy's negligence in

---

[70] Exhibit A at 5, 6.

rendering or failing to render professional services. Under Alaska law, Worthy's brutish domestic violence is not a professional service of any profession and did not potentially trigger coverage under Worthy's errors and omissions policy.

Worthy's sworn testimony establishes, as a matter of law, Ivey's complaint did not allege acts, errors, or omissions arising out of Worthy's professional services as an insurance agent. In Worthy's affidavit he stated his duties as a State Farm agent as:

> submitting applications for insurance, collecting initial premiums, membership fees and charges, countersigning and delivering policies, reinstating and transferring insurance, assisting policyholders and cooperating with adjusters and reporting and handling claims, avoiding conflicts of interest and cooperating with and advancing the interests of State Farm, the agents and the policyholders.[71]

Worthy also stated in his affidavit, "[e]mployment decisions, including offers, hires and terminations, were not within the scope of my duties as an insurance agent and were not governed in any way by State Farm."[72]   Thus, Worthy himself believed the allegations raised in Ivey's complaint did not arise out of Worthy's professional services as an insurance agent, and, as a result, the allegations did not potentially trigger coverage under the errors and omissions policy.[73]

---

[71] Exhibit L at Paragraph 3.
[72] Exhibit L at Paragraph 16.
[73] Exhibit L at Paragraph 3.

In conclusion, because Ivey's complaint did not arise out of a negligent act, error or omission in rendering or failing to render professional services as an insurance agent, it did not potentially trigger coverage under Worthy's errors and omissions policy. And because Ivey's complaint did not potentially trigger coverage under the policy, American Home had no duty to defend the suit and no duty to indemnify Worthy for any damages.

### C. CRIMINAL ACT, MALICIOUS ACT, BODILY INJURY, AND INJURY TO TANGIBLE PROPERTY EXCLUSIONS PREVENTED COMPLAINT FROM POTENTIALLY TRIGGERING COVERAGE

As argued above, Ivey's allegations that Worthy assaulted her did not potentially trigger coverage under the American Home errors and omissions policy. However, even if Ivey's complaint had otherwise triggered coverage under the policy, the criminal act, malicious act, bodily injury, and injury to tangible property exclusions excluded Ivey's claims from coverage. This is so because Ivey's claim arose out of criminal conduct to which Worthy pleaded guilty: Worthy's sexual assault against a former girlfriend and intentional damage to her automobile. Therefore, American Home had no duty to defend against Ivey's complaint.

Alaska courts construe grants of insurance coverage broadly and interpret exclusions narrowly. *C.P. ex. Rel. M.L. v. Allstate Ins. Co.*, 996 P.2d 1216 (Alaska 2000). However, when a policy clearly excludes a claim from coverage, the insurer has no duty to defend a claim. *Bellefonte Ins. Co. v. Wayson*, 489

31

F.Supp. 58, 60 (D. Alaska 1980) (ruling that explicit policy exclusion for "personal injury sustained by any person as a result of an offense directly or indirectly related to the employment of such person" prevented coverage when a city police officer claimed he was treated unfairly in response to his performance of an arrest); *Smith v. Great American Ins. Co.*, 629 P.2d 543, 546 (Alaska 1981) (ruling that insurer had no duty to defend a claim because an exclusionary clause preventing coverage for property rented to the insured applied when insured had entered into rental agreement). For example, an insurer had no duty to defend a claim against an insured for bodily injury claims resulting from sexual molestation because the claims were barred by an exclusionary clause preventing coverage for "bodily injury . . . intentionally caused by an insured person." *Allstate Ins. Co. v. Roelfs*, 698 F.Supp. at 820-21.

In *M.C. v. Northern Ins. Co. of New York*, the Alaska Supreme Court affirmed a grant of summary judgment to an insurer on a duty to defend case on the ground that an exclusionary clause prevented coverage. 1 P.3d 673, 676 (Alaska 2000). In that case, a manager of a newspaper had sexually abused an employee under his supervision. *Id*. at 673. The newspaper's insurer had disclaimed coverage and refused to defend. The plaintiff had settled with the manager for an assignment of rights against the insurer. *Id*. at 674. The superior court had granted the insurer

summary judgment on the ground that the exclusionary clause forestalled any duty to defend. *Id.*

The exclusion clause at issue in that case stated a newspaper employee was an insured, "but only for acts within the scope of their employment[.]" *Id.* at 675. The Alaska Supreme Court ruled the exclusionary clause prevented coverage from attaching because the manager was not acting within the scope of his employment. *Id.* at 676. Therefore, the insurer had no duty to defend. *Id.*

The Alaska Supreme Court addressed a criminal act exclusion in *C.P. ex. Rel. M.L. v. Allstate Ins. Co.*, 996 P.2d 1216 (Alaska 2000). In that case the adult son of homeowners assaulted a child visiting their home. *C.P. ex. Rel. M.L.*, 996 P.2d at 1218. The child and her parents sued the homeowners, claiming they had negligently caused the child's injuries. *Id.* Invoking exclusions for intentional and criminal acts,[74] the homeowners' liability insurer refused to defend. *Id.* The Alaska Supreme Court interpreted the intentional and criminal acts exclusion narrowly and concluded there was coverage because the exclusions did not expressly exclude injury caused by a combination of unintentional or non criminal conduct and by intentional, criminal conduct. *Id.* at 1226. In other words, because the

---

[74] "The criminal act exclusion excluded coverage for bodily injury 'resulting from . . . any act or omission intended or expected to cause bodily injury.'" *C.P. ex Rel. M.L.*, 996 P.2d at 1225.

victim's injuries could have been caused both by the son's criminal acts and the parents' non-criminal acts, the court concluded that the criminal act exclusion did not apply. *Id.* at 1225-26. *C.P.* is distinguishable from the case presently before this Court because Ivey's bodily injuries resulted, not from a combination of causes, but simply and directly from Worthy's criminal and malicious acts.[75]

Numerous courts outside this jurisdiction interpreting criminal act exclusions have ruled such exclusions prevent coverage for claims arising out of criminal acts.[76] In *Allstate*

---

[75] Exhibit B.

[76] *See, e.g.*, *Allstate Ins. Co. v. Lewis*, 918 F. Supp. 168, 170-73 (S.D. Miss. 1995) (concluding that criminal acts exclusion in homeowner's policy which barred recovery for injury or property damage resulting from criminal acts of insured and provided further that "this exclusion applies regardless of whether insured person is actually charged with, or convicted of, a crime," was not against Mississippi public policy and because it was clear and unambiguous, and it would be enforced where insured was convicted of voluntary manslaughter); *Allstate Ins. Co. v. Barnett*, 816 F. Supp. 492, 494, 497 (S.D. Ind. 1993) (where insured shot victim, court held that criminal acts exclusion was unambiguous and provided objective standard and was enforceable to exclude coverage when the policy excluded from coverage damages "which may reasonably be expected to result from the intentional or criminal acts of an insured person or which are in fact intended by an insured person"); *American Family Mutual Ins. Co. v. White*, 65 P.3d 449, 504-05 (Ariz. App. 2003) (conviction for reckless assault constituted violation of criminal law for purposes of criminal conduct exclusion because exclusion applied to all criminal acts that result in conviction, and not just intentional acts); *20th Century Ins. Co. v. Schurtz*, 92 Cal. App. 4th 1188, 1192-96 (Cal. App. 2001) (conviction for assault with firearm constituted criminal conduct for purposes of criminal conduct exclusion and ruling "where, as here, an insurer does want to exclude criminal acts from coverage and *has*

34

*Ins. Co. v. Peasley*, the Washington Supreme Court held an insurance policy's criminal acts exclusion excluded coverage where the insured had pleaded guilty to second-degree reckless endangerment for the accidental shooting of a friend. 932 P.2d 1244, 1249 (Wash. 1997). In that case, the insured, Peasley, was entertaining the victim when Peasley shot her. *Id.* at 1246. Both Peasley and the victim maintained the shooting was accidental, but based on interviews of neighbors who heard a loud argument from Peasley's house at the time of the shooting, the prosecutor charged Peasley with second-degree assault. *Id.* Peasley was tried and convicted, but his conviction was reversed on appeal by the appellate court because of an erroneous jury instruction. *Id.* Subsequently, Peasley pleaded guilty to second-degree reckless endangerment in exchange for the prosecutor's recommendation of a suspended sentence. *Id.* When the shooting victim sued Peasley for damages arising from her

---

expressly done so in language that is clear and unambiguous, the exclusion will be given effect"); *Allstate Ins. Co. v. Juniel*, 931 P.2d 511, 514-16 (Colo. App. 1996) (guilty pleas for second-degree felony assault and misdemeanor menacing constituted criminal conduct for purposes of criminal conduct exclusion, ruling "courts of various jurisdictions support the trial court's determination that a generally worded criminal exclusion, as here, eliminates from coverage more than just intentional crimes or injuries intended or reasonably expected"); *Allstate Ins. Co. v. Schmitt*, 570 A.2d 488, 492 (N.J. Super. Ct. 1990) (ruling a criminal act exclusion prevents coverage even without a culpable mental state requirement and that the exclusion does not offend public policy because "the words 'criminal act' are not modified by any descriptive culpability requirement").

injuries, Peasley's homeowner's insurance policy insurer brought a declaratory judgment action seeking to establish the policy's criminal act exclusion prevented coverage for the victim's injuries because they resulted from Peasley's criminal act. *Id.* The trial court granted the insurer summary judgment and the Court of Appeals affirmed. *Id.*

The exclusion at issue in *Peasley* provided, "[w]e do not cover any bodily injury which may reasonably be expected to result from the intentional or criminal acts of an insured person or which are in fact intended by an insured person." *Id.* at 1247. The court first ruled the exclusion was not ambiguous based on the plain meaning of "criminal" and "crime." *Id.* at 1247-48. Because the exclusion was not ambiguous, the court stated it was required to enforce the policy as written.

The court also ruled the criminal act exclusion encompassed both intentional and unintentional crimes for two reasons. First, the court so ruled because the exclusion clause disclaimed coverage for both criminal and intentional acts and to give effect to the intentional act provision, the court was required to read the criminal act provision as including both intentional and unintentional crimes. *Id.* at 1249. Second, the court so ruled because nearly every jurisdiction in the country to examine the phrase has ruled that "criminal acts" included not just intentional acts but also unintentional acts. *Id.* (citing

36

*Allstate Ins. Co. v. Brown*, 16 F.3d 222, 223-26 (7th Cir. 1994) (concluding that conviction for criminal recklessness constituted criminal conduct for purposes of criminal conduct exclusion); *Allstate Ins. Co. v. Burrough*, 914 F. Supp. 308, 312 (W.D. Ark. 1996) (the clause "includes all criminal acts, no matter what the mental state required for their commission"); *Steinke v. Allstate Ins. Co.*, 621 N.E.2d 1275, 1279 (Ohio App. 1993) (no contest plea to disorderly conduct triggered the exclusionary clause); *Allstate Ins. Co. v. Sowers*, 776 P.2d 1322, 1323 (Or. App. 1989) (insured's resisting arrest triggered criminal acts exclusion despite insured's lack of intent to injure police officer). Finally, the court ruled interpreting an exclusion clause to exclude coverage for unintentional crimes did not violate public policy. *Peasley*, 932 P.2d at 1250.

Similarly, courts outside this jurisdiction have ruled insurance coverage is not triggered when a policy contains a criminal act exclusion or a bodily injury exclusion and the insured commits assault or sexual assault.[77] In *Bertagnolli*, an

---

[77] *See Bertagnolli v. Ass'n of Trial Lawyers Assurance*, 934 P.2d 916, 918-19 (Col. Ct. App. 1997) (applying Illinois law); *see also Stiglich v. Tracks, D.C., Inc.,* 721 F.Supp. 1386, 1388 (D.D.C. 1989)(no coverage for negligence claim against night club for failing to protect patron from personal injury at the hands of third party because proof of excluded act or omission was necessary to make the claim); *Perrine Food Retailers v. Odyssey LTD,* 721 So.2d 402, 404 (Fla. Dist. Ct. App. 1998) (no coverage for negligence claim against store owner for personal injuries sustained at the hands of unknown third persons during a robbery

attorney filed a declaratory judgment action against his insurer, seeking to establish the insurer had wrongly refused to defend him in an underlying suit. *Bertagnolli*, 934 P.2d at 918. In the underlying suit two former clients brought claims against the attorney for battery, outrageous conduct, false imprisonment, breach of fiduciary duty, and professional negligence. *Id*. The attorney's insurer had denied a duty to defend under the express terms of the policy. *Id*. The policy expressly excluded coverage for: "any claim the sole allegation of which is that of a willful violation of a criminal statute." *Id*. The trial court had granted summary judgment for the insurer. Thus, the Colorado Court of Appeals considered whether a criminal conduct exclusion clause excluded coverage for an attorney's sexual assault of his client. *Id*. at 918-19.

On appeal, the attorney claimed the policy's criminal act exclusion did not apply because the plaintiffs had included claims for breach of fiduciary duty, professional negligence, etc., for which coverage was proper. *Id*. But the appellate

---

where exclusion precluded coverage for all claims arising out of an assault and battery from "any causes whatsoever"); *Ross v. City of Minneapolis,* 408 N.W.2d 910, 913-14 (Minn.Ct.App. 1987) (negligence claim causally connected to assault and battery unambiguously excluded by assault and battery exclusion); *Hunt v. Capitol Indem. Corp.*, 26 S.W.3d 341, 344-45 (Mo. Ct. App. 2000) (exclusionary clause specifically stating coverage does not apply to bodily injuries arising out of assault or battery excludes from coverage a claim arising from assault and battery even when committed by a third person other than the insured).

court rejected the attorney's argument. Noting that sexual assault was alleged in the complaints for each and every claim for relief, the court refused to allow the attorney to "fragment the illegal sexual assault into a series of non-criminal acts" in order to avoid the criminal conduct exclusion. *Id*. The court noted that doing so ignored the reality of the situation: that "each [non-criminal] act was but one step in the culmination of the single criminal episode and as such is excluded from coverage." *Id*. Thus, the appellate court affirmed summary judgment for the insurer because the essence of plaintiff's claim arose from the attorney's criminal act and because the policy excluded coverage for claims arising from willful criminal acts.

Here, Worthy's errors and omissions policy excluded several types of claims from coverage. Under the heading, "Exclusions," the policy's declarations page stated that the policy does not apply "[t]o any claim arising out of any … criminal … or malicious act" or "[t]o any claim arising directly out of bodily injury to … any person, or injury to any tangible property, including the loss thereof".[78] These exclusion clauses, explicitly excluding from coverage claims arising out of any criminal act, any malicious act, bodily injury to a person, or injury to tangible property, prevented Ivey's complaint from potentially triggering coverage. Assault, sexual assault, and

---

[78] *See* Exhibit M at 2.

intentionally damaging tangible property are criminal acts, as evidenced by Worthy's guilty pleas to fourth-degree Assault and fourth-degree Criminal Mischief, respectively.[79]  This court, like the vast majority of jurisdictions throughout the country, should rule that the clear and unambiguous language of the exclusion clause in Worthy's errors and omissions policy excluded coverage for claims arising out of Worthy's criminal and malicious acts, which resulted in bodily injury to Ivey and damage to Ivey's automobile.  The physical injuries Ivey sustained as a result of Worthy's attempts at strangling her and by forcing his hand into her vagina[80] constitute bodily injury.  And the intentional damage Worthy inflicted on Ivey's automobile by "slashing her [automobile] tires, breaking the [automobile] windows and lights, and pouring buckets of  paint throughout the interior of the car"[81] constitute injury to tangible property.  Therefore, the clear and unambiguous language of the exclusion clauses prevents coverage for these claims.

The result here is thus different from that in *Sauer v. Home Indem. Co.*, where the court refused to consider whether the policy's pollution exclusion prevented coverage, ruling rather that the "damages suffered by the residents were at least potentially outside the scope of the pollution exclusion and thus

---

[79] Exhibit B at 1,2, respectively.
[80] Exhibit A at 5.
[81] Exhibit A at 6.

potentially within policy coverage, necessitating a duty to defend." 841 P.2d 176, 182 (Alaska 1992). Unlike such cases in which courts have ruled an insurer had a duty to defend despite a possibility that coverage for the claim was excluded, in this case, the criminal act, malicious act, bodily injury, and injury to tangible property exclusions completely precluded any potential for coverage of the claim arising out of Worthy's assault, sexual assault, and malicious vandalism of his former girlfriend's automobile. Because Ivey's complaint arose out of Worthy's criminal and malicious acts, Ivey's bodily injuries, and the intentional damage to Ivey's automobile, the errors and omissions policy explicitly excluded Ivey's claim. Therefore, the policy could not potentially have covered the complaint. As a result, American Home had no duty to defend against the complaint and no duty to indemnify for any damages. *See Makarka*, 14 P.3d at 969-70; *O'Neill Investigations, Inc.*, 636 P.2d at 1176-77.

### 1. Ivey Is Estopped From Arguing The Complaint Did Not Arise Out Of A Criminal Act

Neither Worthy, nor Ivey (acting under an assignment of Worthy's rights) can relitigate Worthy's guilty pleas to fourth-degree Assault[82] and fourth-degree Criminal Mischief.[83] The Alaska Supreme Court has ruled "a civil plaintiff is collaterally

---

[82] Alaska Stat. § 11.41.230.
[83] Alaska Stat. § 11.46.484.

estopped from relitigating any element of a criminal charge to which he has pled *nolo contendere*." *Burcina v. City of Ketchikan*, 902 P.2d 817, 822 (Alaska 1995).[84]  The Ivey plaintiffs are thus barred from arguing the claim did not arise out of a criminal act.[85]

In *Burcina*, a mental patient bringing suit against his mental health facility and his psychologist was estopped from relitigating the issue of whether he was sane when he committed arson.  The court explained that public policy "precludes a person who has been convicted of a crime from imposing liability on others for the consequences of that antisocial conduct."  *Id.* at 820 (citing Beilgard v. State, 896 P.2d 230, 233-34 (Alaska 1995); *Shaw v. State*, 861 P.2d 566 (Alaska 1993)("Shaw II"); *Lord v. Fogcutter Bar*, 813 P.2d 660, 663-64 (Alaska 1991); *Adkinson v. Rossi Arms Co.*, 659 P.2d 1236, 1240 (Alaska 1983)).  Thus, the court affirmed the superior court's dismissal of plaintiff's

---

[84] The U.S. District Court for the District of Alaska has also ruled a guilty plea in a criminal action estops a party from subsequently re-litigating issues underlying that guilty plea. *Municipality of Anchorage v. Hitachi Cable, Ltd.*, 547 F.Supp. 633, 641-42 (Alaska 1982) (noting under well-established principles of the Ninth Circuit and other circuits, a guilty plea may give rise to collateral estoppel).

[85] *See Lamb v. Anderson*, No. S-11936, 2005 WL 3498317, at *1, -- P.3d -- (Alaska 2005) (ruling that a civil defendant in a personal injury action arising from a drunk driving accident was collaterally estopped from disputing the essential elements of the offense to which he had pleaded no contest).

claims against the mental health facility and his psychologist. *Id.* at 823.

Worthy, having pleaded guilty to two crimes, could not now claim that he did not commit criminal conduct. Allowing Worthy to claim he did not commit criminal conduct would be tantamount to allowing him to relitigate his entire criminal case. Alaska case law and public policy explicitly preclude Worthy from doing so. Similarly, Alaska case law and public policy preclude the Ivey plaintiffs, who are standing in Worthy's position, because they are acting under a purported assignment from Worthy, from relitigating Worthy's criminal case. *See id.* at 821, 822. Therefore, the Ivey plaintiffs cannot now argue their claims against Worthy did not arise out of a criminal act, and that the policy's criminal act exclusion should not apply.

As demonstrated by Worthy's guilty pleas, Ivey's claims against Worthy arose out of criminal acts. Even if Ivey's claims were not otherwise prevented from triggering coverage because the policy covered only negligence in rendering professional services, the errors and omissions policy exclusion for claims arising from a criminal act nevertheless would have excluded Ivey's claims from coverage under the act. This is so because fourth-degree Assault and fourth-degree Criminal Mischief

represent criminal acts.[86]  And the malicious act, bodily injury, and injury to tangible property exclusions also prevent coverage because Ivey's claim arose directly out of a malicious act, T.J. Ivey's bodily injury, and the intentional damage to T.J. Ivey's automobile.  Because Ivey's claims could not have triggered coverage under the errors and omissions policy, American Home had no duty to defend against the complaint and no duty to indemnify.  Therefore, American Home is entitled to summary judgment on the Ivey plaintiffs' claims.

## IV.  CONCLUSION

In sum, American Home is entitled to summary judgment for the following reasons: (1) the complaint in the sexual assault suit did not potentially trigger coverage under the errors and omissions policy because the policy covered only negligent acts, errors, and omissions in rendering or failing to render professional services; and (2) the policy's criminal act, malicious act, bodily injury and property damage exclusions excluded Ivey's claim from coverage because the claim arose out of criminal sexual assault and intentional property damage, to which Worthy pleaded guilty.  For the foregoing reasons, this

---

[86] Exhibit B at 1-2.

Court should grant American Home's motion for summary judgment at this time.

DATED at Anchorage, Alaska, this 9th day of February, 2006.

DELANEY, WILES, INC.
Attorneys for Defendant
American Home Assurance Company

s/Andrew Guidi
Alaska Bar No.: 8312171
1007 West Third Avenue, Suite 400
Anchorage, Alaska  99501
PHONE: 907-279-3581/FAX: 907-277-1331

and

s/William R. Warnock, Jr.
Alaska Bar No.: 0505034
1007 West Third Avenue, Suite 400
Anchorage, Alaska  99501
PHONE:  907-279-3581/FAX:  907-277-1331

**Certificate of Service**

I hereby certify that on the 9th day
of February, 2006, a copy of **AMERICAN
HOME ASSURANCE COMPANY'S MEMORANDUM IN
SUPPORT OF MOTION FOR SUMMARY JUDGMENT**
was served electronically and via
USPS, first class mail, postage prepaid on:

Phillip Paul Weidner
WEIDNER & ASSOCIATES, INC.
330 L. Street, Suite 200
Anchorage, AK 99501

s/Andrew Guidi and William R. Warnock, Jr. (113260)